CR 22-288 JNE

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) PLEA AGREEMENT AND |
| v. | ) SENTENCING STIPULATIONS ) |
| BRADLEY HANS RATGEN, | ) ) |
| Defendant. | ) |

The United States of America and Bradley Hans Ratgen (hereinafter referred to as the "defendant") agree to resolve the above-captioned case on the terms and conditions that follow. This plea agreement binds only the defendant and the United States Attorney's Office for the District of Minnesota. This agreement does not bind any other United States Attorney's Office or any other federal or state agency.

1. **Charges**. The defendant agrees to plead guilty to Count 1 of the Information, charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

2. **Factual Basis**. From in or about 2015 and continuing thereafter through in or about 2021, in the State and District of Minnesota and elsewhere, the defendant willfully and knowingly conspired with other persons to execute a scheme and artifice to defraud providers of automobile insurance policies, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts,

1



money and property owned by and under the custody and control of providers of automobile insurance policies, in connection with the delivery of and payment for health care benefits, items, and services.

At relevant times, the defendant was an attorney residing in Minnesota and licensed by the Minnesota Supreme Court. The defendant was involved in a legal practice that focused primarily on pursuing personal injury claims on behalf of individuals who had been in car accidents.

In or about June 2015, a Minnesota Commerce Fraud Bureau (CFB) confidential informant ("CI 1") contacted an unindicted individual, L.B., who was known to CFB to be a "runner." A runner is a person who gets paid to recruit patients who have purportedly been in car accidents to i) receive chiropractic treatment funded by automobile insurance; and ii) in many cases, with an attorney's assistance, sue the automobile insurance company for their purported bodily injuries. CFB knew that the defendant had illegally paid L.B. in the past to bring the defendant clients who had purportedly sustained bodily injuries in car accidents. The defendant represented those patients in their bodily injury cases against automobile insurance companies.

On June 9, 2015, under CFB audio-recorded surveillance, CI 1 met with L.B. in a parking lot in St. Paul, Minnesota. At this meeting, L.B. asked CI 1 to find and recruit persons who had purportedly been injured in automobile accidents. L.B. promised to pay CI 1 $500 for every purportedly-injured person CI 1 recruited. L.B. told CI 1 that L.B. would bring each person recruited by CI 1 to a chiropractor to receive treatments as

"patients" of that chiropractor. L.B. also told CI 1 that L.B. would bring each person recruited by CI 1 to the defendant's personal injury law practice to become "clients" of the defendant, who would then sue, or threaten to sue, automobile insurance companies for purported bodily injuries resulting from the car accidents.

The defendant paid L.B approximately $300 for each person L.B. recruited, or succeeded in having others (such as CI 1) recruit, to become a client of his personal injury law practice. However, the defendant would pay L.B. only for recruiting clients who had a "good case." A recruited client had a "good case" only if i) the recruited client sustained purported injuries in a vehicle that had valid automobile insurance; ii) the recruited patient was not the "at fault" driver; and iii) the recruited patient attended a minimum, threshold number of treatment sessions with the conspirator-chiropractor. The defendant knew L.B. would also be paid additional amounts by the conspirator-chiropractors for recruiting and referring patients/clients with "good cases."

The defendant, a Minnesota attorney, knew that Minnesota law prohibited paying a runner to recruit patients to receive chiropractic care funded by automobile insurance, and that automobile insurers had no obligation to pay claims of injured persons who had been recruited by runners. The defendant also knew that runners pay patients a portion of their kickback in an effort to keep the patients treating with a chiropractor.

After the initial meeting with L.B., CI 1 introduced L.B. to 2 undercover CFB agents, who posed as a couple who had recently been in a car accident together. L.B. took the two undercover agents ("Patient 1" and "Patient 2") to an unindicted conspirator-

chiropractor's office ("Chiropractor 1") for treatment for their "injuries." L.B. also took the undercover agents to the defendant's personal injury law practice, where they signed paperwork to have defendant represent them in their bodily injury cases against the insurance company. Chiropractor 1 proceeded to treat Patient 1 and Patient 2 for their purported "injuries."

In the course of the CFB undercovers' interactions with L.B., the undercover posing as Patient 1 agreed to recruit additional patients/clients in furtherance of the scheme, and L.B. agreed to pay Patient 1 $500 for each person recruited. By July 2015, L.B. owed Patient 1 $500 under this arrangement, but L.B. refused to make the payment.

Thus, on July 21, 2015, Patient 1 placed a recorded telephone call to the defendant, complaining that L.B. had defaulted on the $500 payment. The defendant indicated he would speak with L.B. to "get in line and come through with whatever he said." Patient 1 told the defendant that both he (Patient 1) and Patient 2 would be "hitting the pause button" on their treatments with Chiropractor 1 until L.B. made good on his promise to pay him.

On July 23, 2015, Chiropractor 1 paid the undercover (Patient 1) $500 in cash in L.B.'s stead. Patient 1 called the defendant to thank him for making the payment happen. During the recorded call, the defendant said, "Truth be told, [Chiropractor 1] is the guy that got stuff figured out or taken care of… If you can follow his recommended treatment program, that would be doing him a solid for him doing you a solid." Patient 1 and Patient 2 then resumed their treatments with Chiropractor 1.

In 2019, a second CFB confidential informant ("CI 2") contacted A.M., another

4

known runner for the defendant. A.M. had previously paid CI 2 $1,000 to receive chiropractic care from a chiropractor ("Chiropractor 2"), and to become the defendant's client, in connection with a purported car accident that occurred in 2017, before CI 2 was known to CFB.

During a recorded phone call, CI 2 told A.M. that he had been involved in a second car accident and was looking for "good money." A.M. took CI 2 to the defendant's personal injury law practice, where the defendant signed up CI 2 as a client. A.M. then took CI 2 to a clinic owned by Chiropractor 2. During the intake at the clinic, CI 2 reported a pain level of 4 out 10. A.M. instructed CI 2 to change his pain level to a 6 out of 10. After the ninth chiropractic treatment, A.M. paid CI 2 $1,000. CI 2 continued to attend chiropractic treatment sessions with Chiropractor 2 into 2020.

On November 30, 2020, the defendant sent a demand letter to State Farm as the attorney for CI 2. In that letter, the defendant demanded that State Farm pay a $30,000 bodily injury settlement to CI 2. The defendant paid A.M. for recruiting CI 2 to be the defendant's client.

In July 2021, CFB special agents notified the defendant that the defendant was a target of this investigation. Despite this warning, during the fall of 2021, the defendant continued to negotiate a settlement with State Farm related to CI 2. On November 3, 2021, State Farm mailed a check in the amount of $3,500 to the defendant's personal injury practice as final settlement of CI 2's bodily injury claim.

The defendant acknowledges that his conduct violated Title 18, United States Code,

Section 1349.

3. **Waiver of Indictment**. The defendant agrees to waive indictment by a grand jury on this charge and to consent to the filing of a criminal information. The defendant further agrees to execute a written waiver of his right to be indicted by a grand jury on this offense in open court.

4. **Waiver of Pretrial Motions**. The defendant understands and agrees that he has certain rights to file pre-trial motions in this case. As part of this plea agreement and based upon the concessions of the United States within this plea agreement, the defendant knowingly, willingly, and voluntarily gives up the right to file pre-trial motions in this case.

5. **Statutory Penalties**. The defendant understands that the maximum statutory penalties for conspiracy to commit health care fraud, as charged in Count 1 of the Information, are as follows:

   a. a term of imprisonment of up to 10 years;

   b. a fine of up to $250,000 or twice the gross gain or loss;

   c. a term of supervised release of up to three years;

   d. a special assessment of $100.00, which is payable to the Clerk of Court prior to sentencing;

   e. payment of mandatory restitution in an amount to be determined by the Court; and

   f. assessment to the defendant of the costs of prosecution (as defined in 28 U.S.C. § 1918(b) and 1920).

6. **Revocation of Supervised Release**. The defendant understands that if he were to violate any condition of supervised release, he could be sentenced to an additional term of imprisonment up to the length of the original supervised release term, subject to the statutory maximums set forth in 18 U.S.C. § 3583.

7. **Guideline Calculations**. The parties acknowledge that the defendant will be sentenced in accordance with 18 U.S.C. § 3551, *et seq*. The parties also acknowledge that the Court will consider the United States Sentencing Guidelines to determine the appropriate sentence and stipulate to the following guideline calculations:

    a. Base Offense Level. The parties agree that the base offense level is **6** pursuant to U.S.S.G. § 2B1.1(a)(1).

    b. Specific Offense Characteristics. The parties agree that the offense level should be increased by **6 levels** because the intended loss amount exceeded $40,000 but was less than $95,000. U.S.S.G. § 2B1.1(b)(1)(D). The parties agree that no other specific offense characteristics apply.

    c. Chapter Three Adjustments. The parties agree that the base offense level should be increased by **2 levels** because the defendant abused a position of trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3. Other than as provided for below concerning acceptance of responsibility, the parties agree that no other Chapter 3 adjustments apply.

    d. Acceptance of Responsibility. The United States agrees to recommend that the defendant receive a **2-level** reduction for acceptance of responsibility and to make any appropriate motions with the Court. However, the defendant understands and agrees that this recommendation is conditioned upon the following: (i) the defendant testifies truthfully during the change of plea and sentencing hearings, (ii) the defendant provides complete and truthful information to the Probation Office in the pre-sentence investigation, and (iii) the defendant commits no further acts inconsistent with

acceptance of responsibility. U.S.S.G. § 3E1.1.

e. Criminal History Category. Based on information available at this time, the parties believe that the defendant's criminal history category is **I**. This does not constitute a stipulation, but a belief based on an assessment of the information currently known. The defendant's actual criminal history and related status will be determined by the Court based on the information presented in the Presentence Report and by the parties at the time of sentencing.

f. Imprisonment Range. If the adjusted offense level is **12**, and the criminal history category is **I**, the Guidelines imprisonment range is **10 to 16 months**. (U.S.S.G. Ch. 5, Pt. A).

g. Fine Range. If the adjusted offense level is **12**, the fine range is **$5,500 to $55,000**. (U.S.S.G. § 5E1.2(c)(3)).

h. Supervised Release. The Guidelines advise a term of supervised release of **at least one but not more than three years**. (U.S.S.G. § 5D1.2).

i. Sentencing Recommendation and Departures. The parties reserve the right to make motions for departures from the applicable Sentencing Guidelines range and to oppose any such motions made by the opposing party. The parties reserve the right to argue for a sentence outside the applicable Sentencing Guidelines range.

8. **Discretion of the Court**. The foregoing stipulations are binding on the parties but do not bind the Court. The parties understand that the Sentencing Guidelines are advisory and that their application is a matter that falls solely within the Court's discretion. The Court may make its own determination regarding the applicable guideline factors and the applicable criminal history category. The Court may also depart from the applicable guidelines. If the Court determines that the applicable guideline calculation or the defendant's criminal history category is different from that stated above, the parties

may not withdraw from this agreement, and the defendant will be sentenced pursuant to the Court's determinations.

9. **Special Assessment**. The Guidelines require payment of a special assessment in the amount of $100.00 for each felony count of which the defendant is convicted. U.S.S.G. § 5E1.3. The defendant agrees to pay the $100 special assessment prior to sentencing.

10. **Restitution**. The defendant understands and agrees that the Mandatory Restitution Act, 18 U.S.C. § 3663A, applies and that the Court is required to order the defendant to make restitution to the victims of his crime. The parties agree that the amount of restitution is $22,748.18.

The defendant represents that the defendant will fully and completely disclose to the United States Attorney's Office the existence and location of any assets in which the defendant has any right, title, or interest. The defendant agrees to assist the United States in identifying, locating, returning, and transferring assets for use in payment of restitution and fines ordered by the Court. The defendant agrees to complete a financial statement fully and truthfully before the date of sentencing.

11. **Forfeiture**. The defendant understands and agrees that the United States reserves its right to seek a personal money judgment forfeiture against the defendant, and to proceed against any of the defendant's property, whether directly forfeitable or substitute property, in a civil, criminal, or administrative forfeiture action if said property is subject to forfeiture under federal law. The defendant agrees not to contest any such forfeiture

9

proceedings, so long as the government meets the required legal standards.

12.     **Waivers of Appeal and Collateral Attack**.     The defendant understands that 18 U.S.C. § 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this right, and in exchange for the concessions made by the United States in this plea agreement, the defendant hereby waives all rights conferred by 18 U.S.C. § 3742 to appeal the defendant's sentence, unless the sentence exceeds 16 months of imprisonment.  In addition, the defendant expressly waives the right to petition under 28 U.S.C. § 2255. The United States also waives its right to seek appellate review of any sentence imposed by the Count on any ground set forth in 18 U.S.C. § 3742 unless the sentence is less than 10 months of imprisonment.  However, the waivers by the defendant noted above shall not apply to a direct appeal or post-conviction collateral attack based on a claim of ineffective assistance of counsel.  The defendant has discussed these rights with his attorney. The defendant understands the rights being waived, and he waives these rights knowingly, intelligently, and voluntarily.

13.     **Freedom of Information Act Waiver**.    The defendant waives all rights to obtain, directly or through others, information about the investigation and prosecution of this case under the Freedom of Information Act and the Privacy Act of 1974, 5 U.S.C. §§ 552, 552A.

14. **Complete Agreement.** This agreement, along with any other written documents signed by the parties before the change of plea hearing, constitute the entire agreement of the parties. There are no other oral or otherwise side understandings of the parties regarding disposition.

Date: 11/17/22

ANDREW LUGER
United States Attorney

By: _____
HARRY M. JACOBS
Assistant U.S. Attorney

Date: 11/17/22

_____
BRADLEY HANS RATGEN
Defendant

Date: 11/17/22

_____
KEVIN RIACH
Attorney for Defendant

11